# IN THE COURT OF APPEALS OF IOWA

No. 14-0565
Filed January 14, 2015

**JBS SWIFT & COMPANY and
ZURICH AMERICAN INSURANCE
COMPANY,**
        Petitioners-Appellants,

**vs.**

**WAYNE HEDBERG,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Randy V. Hefner,

Judge.


        Appeal from the district court decision on judicial review, affirming the

agency's award of permanent total disability benefits.   **REVERSED AND**

**REMANDED.**


        Jennifer A. Clendenin and Nicholas J. Pellegrin of Ahlers & Cooney, P.C.,

until withdrawal, then Mark A. King of Patterson Law Firm, L.L.P., Des Moines,

for appellants.

        Nathaniel R. Boulton of Hedberg & Boulton, P.C., Des Moines, for

appellee.


        Heard by Mullins, P.J., and Bower and McDonald, JJ.

**McDONALD, J.,**

JBS Swift & Company and Zurich American Insurance Company, (hereinafter "employer" or "Swift") appeal from the district court ruling affirming the agency's award of permanent and total disability benefits to workers' compensation claimant Wayne Hedberg.

I.

Hedberg commenced employment with Swift in 1990. In 2010, Hedberg sustained a work-related injury to his right shoulder and filed a claim for workers' compensation benefits. During the agency proceeding, the parties stipulated to the following facts:

> Hedberg sustained an injury to his right shoulder and arm on May 7, 2010. After his injury Hedberg continued working in light-duty positions within his temporary work restrictions until his surgery on December 31, 2010. Hedberg moved to Minnesota on January 3, 2011. As of March 28, 2011, Swift notified Hedberg there was work available to him within his temporary work restrictions, but did not provide job descriptions. Swift notified Hedberg there was work available for him within his permanent work restrictions. Hedberg did not return to work at Swift after his December 31, 2010 surgery and did not seek other employment. Hedberg was notified on August 8, 2011, that he was deemed a voluntary quit for failing to report back to work.

Hedberg moved to Minnesota following his December 31 surgery because he was unable to care for himself following the unexpected death of his wife in December 2010. Hedberg's inability to care for himself following his wife's death was unrelated to his work injury. Instead, the record reflects Hedberg suffered a variety of conditions for most of his life—including cerebral lupus, mild cerebral palsy, and significant hearing impairment—that required him to have the assistance of others. Because of these and other conditions, Hedberg's family

decided Hedberg would move to Minnesota to live with his younger brother. Hedberg testified if his wife had not died, he would have stayed in Iowa and continued to work at Swift.

After Hedberg's surgery in December 2010, two doctors provided opinions regarding Hedberg's work restrictions and impairment rating. Dr. Neff was Hedberg's treating physician/surgeon; Dr. Bansal performed an independent medical evaluation. On May 23, 2011, Dr. Neff stated, "I am pleased with his progress; but I agree he will never have the same shoulder that he had before, and repetitive intensive overhead activity is not going to be possible." In his evaluation on July 20, 2011, with Hedberg having attained maximum medical improvement, Dr. Neff opined:

> I am not certain how best to proceed determining impairment evaluation for the right upper extremity. Active range of motion done by the patient upon request shows significant disparity between passive motion.
> In light of the above, I do not feel comfortable attributing impairment based on range of motion loss. The 5th edition of the AMA Guides reflects a 10% impairment attributable as a result of AC joint resection arthroplasty; and consequently, it is my opinion that he has a 10% impairment to the right upper extremity as a result of AC joint resection arthroplasty and a 1% impairment to the right upper extremity as a result of elbow range of motion loss. There is no impairment attributed as a result of cubital tunnel syndrome.
> Consequently, adding these he has an 11% impairment to the right upper extremity as a result of his ongoing circumstance.

Dr. Bansal recommended the following restrictions: "no lifting greater than lifting up to 15 pounds along with no lifting over shoulder level or away from her [sic] body . . . ; no frequent lifting, pushing, or pulling . . . ; no pushing, pulling greater than 20 lbs." Dr. Bansal gave Hedberg a 10% upper extremity impairment rating

for his right shoulder, with a 16% impairment of the whole person, and a 6.7% upper extremity rating for his right elbow, with a 4% rating of the whole person.

Two experts conducted vocational evaluations of Hedberg: Carma Mitchell, retained by Hedberg; and Lana Sellner, retained by Swift. In her report, Mitchell opined:

> Mr. Hedberg has an excellent employment record and has worked the past 20 years despite problems with his hearing and speech. He has sought treatment in an effort to improve the functioning of his right shoulder and upper extremity. The 69% loss of access to the labor market is based on the physical restrictions Mr. Hedberg has from his work related injury. When looking at Mr. Hedberg as a whole with all his limitations his employment options are extremely limited. It is my opinion that with the functional limitations and pain and numbness Mr. Hedberg describes when trying to use his right shoulder and upper extremity along with his limited intellectual functioning, hearing loss and speech impediment he would not be able to obtain or sustain full-time competitive employment.

Sellner's report was admitted into evidence as part of Exhibit K. Sellner's report includes a labor market survey of suitable employment in Minnesota and Iowa as well as a survey of positions at Swift. The report included seven job descriptions of permanent positions at Swift. Referring specifically to the seven positions described in the report, Sellner opined "these occupations identified are viable and within Dr. Neff's restrictions. If one considers Dr. Bansal's restrictions, the occupations identified continue to be viable with the exception [of two of them]." The report also notes the seven identified positions were not the only positions available because "other positions maybe [sic] suitable as well."

Hedberg's workers' compensation claim proceeded to hearing. In its arbitration decision, the deputy commissioner noted Sellner's report included jobs at Swift. The arbitration decision found that Swift offered Hedberg suitable light

duty work beginning March 28, 2011, and concluded that Swift was thus not liable for healing period benefits between March 28 and July 20, 2011. The deputy commissioner also found that Swift offered Hedberg permanent employment within Hedberg's restrictions, that Hedberg did not accept the employment, and that Hedberg was not an odd-lot employee. The arbitration decision found Hedberg had an 80% industrial disability but was not permanently and totally disabled. The parties appealed.

The intra-agency appeal was decided by the commissioner's designee. The appeal decision adopted the arbitration decision with a "modification as to the extent of claimant's permanent disability." The commissioner's designee found and concluded Hedberg's injury "permanently disable[d] him from performing work within his experience, training, education, and physical capacities. Therefore, claimant is entitled to an award of permanent total disability benefits." In support of the award of permanent total disability benefits, the commissioner's designee stated that Swift failed to provide any descriptions of the work available to Hedberg and that Sellner failed to conduct a market survey of the jobs available at Swift:

> No further explanation of the jobs that Swift stood ready to provide to the claimant appear in the record. There is a joint stipulation that the claimant was notified there was work available for him within his permanent restrictions in 2011. Even Lana Sellner, the vocational rehabilitation consultant hired by the defendants, did not provide any jobs from the defendants in her labor market survey. While Ms. Sellner did identify several jobs available to people who would be limited to the light to medium duty work activity, she did not indicate in her report which jobs claimant could actually perform with his hearing and speech impediments.

The appeal decision continued:

> There was no evidence provided herein that actual job openings were available to claimant within the very narrow categories identified in the vocational report by Ms. Sellner, nor was there any credible basis to believe that this worker with his limited education, significant work restrictions, and a work history only in menial physical labor would be a successful candidate for such positions, should they actually exist.

The commissioner's designee continued:

> There was no competitive employment that the claimant could believably work following his shoulder injury. Despite the offers made by the defendants, none of them had any detail even when both Dr. Neff and the counsel for the claimant requested it. The lack of response by the defendants suggests the positions were make work at best.

Swift petitioned for judicial review, and the district court affirmed the agency's action. The district court summarized Swift's contentions as follows: (1) the deputy commissioner failed to give any weight to the report of Lana Sellner of Care Solutions regarding the extent of Hedberg's industrial disability, and (2) the deputy commissioner failed to reconcile the award of permanent and total disability benefits with prior appeal decisions refusing such awards after an employer offered suitable work. The court conducted substantial evidence review and determined the appeal decision "was not illogical, unreasonable, arbitrary or capricious, or inconsistent with prior agency action."

II.

Iowa Code chapter 17A governs our review of the agency's decision. *See* Iowa Code § 86.26 (2013); *Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 888 (Iowa 2014). The district court acts in an appellate capacity to correct errors of law when reviewing the agency's decision. *See Watson v Iowa Dep't of Transp.*, 829 N.W.2d 566, 568 (Iowa 2013); *Ludtke v. Iowa Dep't of Transp.*, 646 N.W.2d

62, 64 (Iowa 2002). "On appeal, we apply the standards of chapter 17A to determine whether we reach the same conclusions as the district court. If we reach the same conclusions, we affirm; otherwise we may reverse." *See Watson*, 829 N.W.2d at 568 (citation omitted).

The crux of the parties' dispute in this appeal is the nature of the question presented and the standard of review. Hedberg argues the sole issue on appeal is whether the appeal decision is supported by substantial evidence. Under this standard, we are bound by the agency's factual determinations if supported by "substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(f); *see Watson*, 829 N.W.2d at 568 (setting forth standard); *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011) (setting forth standard). On substantial evidence reivew, our task "is not to determine whether the evidence supports a different finding; rather, our task is to determine whether substantial evidence . . . supports the findings actually made." *See id.* Swift contends this case does not present a routine question of substantial evidence review. Instead, Swift argues the agency failed to consider a relevant and important matter; took action that was unreasonable, arbitrary, capricious, or an abuse of discretion; and reached a decision that is a product of illogical reasoning. *See* Iowa Code § 17A.19(10)(f), (i), (j), (m), & (n). Specifically, Swift asserts the agency failed to consider and/or explicitly misstated record evidence; failed to consider Hedberg's refusal of full-time work within his permanent work restrictions; and failed to consider Hedberg voluntarily left his

employment for reasons unrelated to his work injury. Swift has the better of the argument.

The record reflects the commissioner's designee simply ignored or overlooked record evidence. The appeal decision correctly notes the "arbitration decision and the defendants' arguments that claimant is employable seem[] to stem from the job offer made by the defendants for sedentary work which would be within claimant's work restrictions." The appeal decision then states "[t]here is no description in the record what kind of work this entailed" and there is "[n]o further explanation of the jobs that Swift stood ready to provide to the claimant appear in the record." The commissioner's designee goes on to state "[e]ven Lana Sellner, the vocational rehabilitation consultant hired by the defendants, did not provide any jobs from the defendants in her labor market survey." All three statements regarding the state of the record are demonstrably incorrect. Sellner's report includes job descriptions and other information for seven positions in Swift's ham boning, kill, and cut departments. The appeal decision also states Sellner "did not indicate in her report which jobs claimant could actually perform with his hearing and speech impediments." Again, the agency's statement of the record is demonstrably incorrect. Page 4 of Sellner's report concludes: "It should be noted these occupations identified are viable and within Dr. Neff's restrictions. If one considered Dr. Bansal's restrictions, the occupations identified continue to be viable with the exception of [two positions]." Page 2 of the report explicitly accounts for Hedberg's "hearing loss and speech impediment." The overlooked evidence is not immaterial; the heart of the appeal

decision is based upon the designee's conclusion that Swift failed to provide evidence of available work and that this purported failure of proof demonstrated Swift had only make-work available for Hedberg.

The deference afforded the agency on substantial evidence review is predicated on the assumption the agency reviewed and considered the evidence in reaching its decision. Where the record affirmatively discloses the agency did not review and consider the evidence, as is the case here, then substantial evidence review is inapplicable. The agency is entitled to reconcile competing evidence, not ignore competing evidence. We thus conclude the commissioner's designee's action is unreasonable, arbitrary, capricious, an abuse of discretion, and the product of illogical reasoning. *See* Iowa Code § 17A.19(10)(i), (j), (m), & (n); *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 225 (Iowa 2006) ("We have said that the commissioner commits error by failing to weigh and consider all of the evidence."); *Armstrong v. State of Iowa Bldgs. and Grounds*, 382 N.W.2d 161, 165 (Iowa 1986) (stating it is reversible error for the commissioner to fail to "weigh and consider all the evidence"); *Buttrey v. Second Injury Fund*, No. 11-0205, 2011 WL 4578449, at *8 (Iowa Ct. App. Oct. 5, 2011) (stating an agency's "opinion grounded upon inaccurate facts does not warrant the deference normally accorded"); *Beef Prods., Inc. v. Rizvic*, No. 10-2083, 2011 WL 3688976, at *6 (Iowa Ct. App. Aug. 24, 2011) (holding commissioner's decision was "illogical, irrational, and wholly unjustifiable" where commissioner's findings relied on misstatements of record evidence).

When the commissioner fails to consider all the evidence, the appropriate remedy is "remand for the purpose of allowing the agency to re-evaluate the evidence" unless the facts are established as a matter of law. *Armstrong*, 382 N.W.2d at 165; *see also Meyer*, 710 N.W.2d at 225 (stating the remedy for failure to consider all evidence "is to remand the case for a decision by the commissioner on the existing record"); *Rizvic*, 2011 WL 3688976, at *6 (affirming district court's remand to agency). Here, we cannot conclude the relevant facts are established as a matter of law. Accordingly, this matter shall be remanded for the purpose of allowing the agency to make a decision based on the existing record.

III.

For the foregoing reasons, we reverse the decision of the district court and remand this case to the agency for a decision based on the totality of the existing record.

**REVERSED AND REMANDED.**